# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF PUERTO RICO

**PLAZA CAROLINA MALL, L.P.,**

**Plaintiff**

**v.**                                                      CIVIL NO. 13-1264 (GAG)

**MUNICIPALITY OF BARCELONETA,**

**Defendant.**

## OPINION AND ORDER

This case deals with the legality of a contract executed by the Municipality of Barceloneta (the "Municipality") and a private entity who owned an outlet mall located within the Municipality, whereby the Municipality awarded it a multimillion dollar incentive grant for the expansion of the outlet mall.   Plaza Carolina Mall, L.P. ("Plaintiff") filed suit against the Municipality, alleging that it is in breach of its obligations under a Development Incentive Agreement (the "DIA"), which Plaintiff claims to be valid and binding.  (See Docket No. 1.)  The Municipality challenges the validity and legality of the DIA and argues it is null and void pursuant to Puerto Rico law and its Constitution.  (See Docket No. 12.)  The Municipality moreover filed a counter claim against Plaintiff seeking to recover the full amount of the monies incorrectly paid under the DIA and accrued interests.  Id. at 10.

Thereafter, and on the same date, Plaintiff and the Municipality each submitted motions for summary judgment and accompanying statements of fact.  (Docket Nos. 33, 34 and 37.)  Both parties submitted substantial oppositions and replies to the memoranda of law and statements of fact.  (Docket Nos. 49, 50, 60, 64, 70, 71, and 81.)  Currently before the court are Plaintiff and the Municipality's cross-motions for summary judgment at Docket Nos. 34 and 37.  After carefully

Civil No. 13-1264 (GAG)

reviewing the parties' submissions and pertinent law, the court **DENIES** Plaintiff's motion for summary judgment at Docket No. 34, and **DENIES in part** and **GRANTS in part** the Municipality's motion for summary judgment at Docket No. 37.

In their motions, both parties assert that they are entitled to judgment as a matter of law. Plaintiff contends that the DIA is a valid and binding contract and requests the court to find that the Municipality breached it by failing to make any payments thereunder since May, 2010 and because it failed to recognize and approve the transfer of the DIA by the original signatory—PR Barceloneta, LLC ("PRB")—to Plaintiff, who claims to be the proper successor in interest. (See Docket No. 34.) Plaintiff also moves the court to order the Municipality to pay all due amounts under the DIA. See id. at 4. The Municipality, in turn, first contends that the complaint must be dismissed because the court's subject matter jurisdiction is premised on diversity of citizenship and Plaintiff did not sufficiently establish that all its partners are diverse; thus, the court lacks diversity jurisdiction over this case. (See Docket No. 37 at 3-6.) The Municipality also contends that the complaint should be dismissed on various substantive grounds, in pertinent part, because the DIA is illegal, null and void and Plaintiff failed to demonstrate it is the real party with interest in this case. See id. at 6-7.

## I.   **Legal Standard of Review**

Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986); see Fed. R. Civ. P. 56(a). "An issue is genuine if 'it may reasonably be resolved in favor of either party' at trial, . . . and material if it 'possess[es] the capacity to sway the outcome of the litigation under the applicable law.'" Iverson

2

Civil No. 13-1264 (GAG)

v. City of Boston, 452 F.3d 94, 98 (1st Cir. 2006) (alteration in original) (internal citations omitted).   The moving party bears the initial burden of demonstrating the lack of evidence to support the non-moving party's case.   Celotex, 477 U.S. at 325.   "The movant must aver an absence of evidence to support the nonmoving party's case.   The burden then shifts to the nonmovant to establish the existence of at least one fact issue which is both genuine and material."   Maldonado-Denis v. Castillo-Rodriguez, 23 F.3d 576, 581 (1st Cir. 1994).   The nonmovant may establish a fact is genuinely in dispute by citing particular evidence in the record or showing that either the materials cited by the movant "do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact."   Fed. R.Civ. P. 56(c)(1)(B).   If the court finds that some genuine factual issue remains, the resolution of which could affect the outcome of the case, then the court must deny summary judgment.   See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

When considering a motion for summary judgment, the court must view the evidence in the light most favorable to the nonmoving party and give that party the benefit of any and all reasonable inferences.   Id. at 255.   Moreover, at the summary judgment stage, the court does not make credibility determinations or weigh the evidence.   Id.   Summary judgment may be appropriate, however, if the nonmoving party's case rests merely upon "conclusory allegations, improbable inferences, and unsupported speculation."   Forestier Fradera v. Mun. of Mayaguez, 440 F.3d 17, 21 (1st Cir. 2006) (quoting Benoit v. Technical Mfg. Corp., 331 F.3d 166, 173 (1st Cir. 2003)).

"Cross-motions for summary judgment do not alter the summary judgment standard, but instead simply require [the court] to determine whether either of the parties deserves judgment as a matter of law on the facts that are not disputed."   Wells Real Estate Inv. Trust II, Inc. v.

Civil No. 13-1264 (GAG)

Chardon/Hato Rey P'ship, S.E., 615 F.3d 45, 51 (1st Cir. 2010) (citing Adria Int'l Group, Inc. v. Ferré Dev. Inc., 241 F.3d 103, 107 (1st Cir. 2001)) (internal quotation marks omitted).  Although each motion for summary judgment must be decided on its own merits, each motion need not be considered in a vacuum.  Wells Real Estate, 615 F.3d at 51 (quoting P.R. American Ins. Co. v. Rivera–Vázquez, 603 F.3d 125, 133 (1st Cir.2010)) (internal quotation marks omitted); Mercado-Salinas v. Bart Enterprises Int'l, Ltd., 852 F. Supp. 2d 208, 213 (D.P.R.) on reconsideration in part, 889 F. Supp. 2d 265 (D.P.R. 2012).  "Where, as here, cross-motions for summary judgment are filed simultaneously, or nearly so, the district court ordinarily should consider the two motions at the same time, applying the same standards to each motion."  Wells Real Estate, 615 F.3d at 51 (quoting P.R. American Ins., 603 F.3d at 133) (internal quotation marks omitted).

## II.    Relevant Uncontested Material Facts

PRB was the owner of the Puerto Rico Premium Outlets, a shopping mall located in the Municipality.  (Docket No. 33 at 1.)  PRB projected to expand the mall, adding more space and more retail stores.  (Docket No. 37-1 at 5.)  The expansion, otherwise referred to as Phase II, was estimated at a cost of thirty eight million dollars.  Id.

The Municipal Legislature passed Ordinance No. Twelve (12), Series 2007-2008 of August 8, 2007 ("Ordinance 12") to authorize and empower then Mayor Sol Luis Fontanes[1] ("the Mayor") to sigh two agreements with PRB, one of which was the DIA.  (Docket No. 1-2 at 2.)  Referring to the DIA, Ordinance 12 states that said agreement "develops an incentive plan so that the municipal sales and use tax generated from the profits on sales from the expansion of the 'Prime Retail Outlets' shopping center will be shared at 50% to be able to attract investors. . . ."  (Docket No. 1-2

---

[1] The Municipality's current mayor is Wanda Soler, who was elected on March 2012 by a group of municipal delegates after Mayor Fontanes had to step down from office after being criminally indicted by the United States government.

4

Civil No. 13-1264 (GAG)

at 2.) (emphasis added)  Ordinance 12 also notes that the Autonomous Municipalities Act, Act No. 81 of August 30, 1991, ("Act 81") P.R. LAWS. ANN. tit. 21, § 4455, in its Article 9.005 provides that "all exchanges, liens, leases, sales, or assignments of municipal property must be approved by the Municipal Legislature, through Ordinance or Resolution to that effect."  (Docket No. 1-2 at 1.)

On August 28, 2007, the Mayor executed the DIA with and benefitting PRB.[2]  (Docket Nos. 33 at 1; 37-1 at 5; 49-1 at 4.)  Through the DIA, the Municipality granted PRB a direct development incentive grant of three million dollars to help finance the expansion of the mall. (Docket No. 33-4.)  The Municipality would pay the incentive grant from the general funds, which would be directly generated from a portion of the sales and use tax derived from the sales of the tenants of Phase II.  (Docket No. 33-4.)

In exchange for the incentive grant, the parties agreed that PRB would complete the construction of Phase II, which the parties agreed would "benefit the economy and the residents of the Municipality through the creation of more jobs, while also increasing the amount of revenues received by the Municipality through municipal personal and property taxes."[3]  (Docket No. 33-4.) The DIA did not, however, provide the mechanism to ensure that the above occurred.  Id.  A copy of the DIA was registered with the Office of the Puerto Rico Comptroller.  (Docket No. 33 at 1.)

---

[2]  PRB and the Municipality are the signatory parties to the DIA.  Plaintiff avers it is the successor-in-interest of PRB; therefore, claims its entitlement to the payments thereunder.

[3]  Plaintiff denied this proposed uncontested fact by the Municipality, yet it only cited the DIA and limited its denial to stating "the text of the DIA speaks for itself" and the "economic benefits are self-evident and expressly discussed therein."  Throughout its Response to the Municipality's statement of purported material facts (Docket No. 49-1), Plaintiff qualifies or denies certain proposed statements by the Municipality by adducing that "the text speaks for itself", either referring to the DIA, municipal ordinances or various audit reports.  These responses are insufficient to comply with Local Rule 56(c).  Other responses by Plaintiff to the Municipality's proposed facts also fail to comply with the fundamental evidentiary requirements applicable to summary judgment under Rule 56.  In any case, and in strict construction of the rules, oppositions or replies to statements of material facts, from either party, that did not comply with Local Rule 56 were deemed admitted by the court.

**Civil No. 13-1264 (GAG)**

The proposed DIA was drafted by PRB and Plaintiff's legal counsel and then sent to the Municipality for its review and comments.  (Docket No. 37-1 at 8; 49-1 at 8.)  The recitals of the DIA state:

> Whereas, the Municipality has enough funds to cover its finances and deems it in its best interest that funds from the <u>general funds</u> of the Municipality be <u>generated from a portion of the municipal sales tax</u> derived from the gross sales of tenants of Phase II, be granted to the Company for purposes of completing the development of Phase II.

(Docket No. 33-4 at 3.)  (emphasis added.)  Pursuant to Section 2.1 of the DIA, titled Development Incentive:

> In order to promote the economic development and the creation and maintenance of jobs in the Municipality, the Municipality hereby <u>grants</u> the Company a <u>development incentive grant</u> pursuant to the Ordinance of Three Million Dollars ($3,000,000.00) for the development of Phase II (hereinafter "Development Incentive Grant").  Said amount shall be paid to the Company from the Municipality's <u>general funds</u>. <u>Section 2.2</u> of this Agreement establishes the <u>manner in which said Development Incentive Grant shall accrue</u> in favor of the Company, and its payment thereunder.

(Id. at 4.)  (emphasis added.)  Pursuant to Section 2.2(a) of the DIA, titled Computation of Development Incentive Grant:

> Sales Tax: Effective as of the date of commencement of operations of Phase II . . . the Municipality <u>shall remit the Company</u> an amount equal to <u>fifty (50%) of all Sales Taxes generated from the gross sales of the tenants</u> of Phase II of the Commercial Center for any given taxable year. The Municipality shall compute, on a monthly basis, the <u>aggregate amount of Sales Taxes</u> generated from the gross sales of the tenants of Phase II, which was collected by the Municipality on or before the 20th day of such month. The Municipality shall then <u>pay to the Company from the general funds</u> of the Municipality. . . an amount equivalent to <u>fifty percent (50%) of the aggregate amount collected by the Municipality</u>. In the case of any amount of Sales Taxes reported by the tenants of Phase II, but not collected by the Municipality on or before the 20th day of any month, the Municipality shall <u>pay to the Company</u>, without prior demand, an amount equal to <u>50% of such Sales Taxes</u> . . . .

6

Civil No. 13-1264 (GAG)

(Docket No. 33-4 at 4-5.)  (emphasis added.)  Pursuant to Section 3.3 of the DIA:

> [PRB] acknowledges and accepts that as a condition to the additional incentive herein granted by the Municipality, [PRB] shall be required to comply with all the applicable provisions of the Ordinance.

(Id. at 7-8.)  The DIA defines "Ordinance" as including Ordinance No. Sixty three (63), Series 2006-2007, of May 9, 2007 ("Ordinance 63") and Ordinance No. Twenty eight (28), Series 2000-2001 of February 14, 2001 ("Ordinance 28"), as amended by Ordinance No. Eighteen (18), Series 2003-2004 of October 8, 2003.  Pursuant to Section 4.8 of the DIA: "No change, waiver, or discharge is valid unless in writing and signed by the party against whom it is sought to be enforced."  (See Id. at 11.)  Phase II was completed and began operating in November, 2008. (Docket No. 33 at 3.)

The incentive grant was not budgeted as an expenditure in the budget for fiscal year 2006-2007, nor for fiscal year 2007-2008.  (Docket 37-2.)  It was not budgeted in any future years either. Id.  As to the Municipality's financial state, during fiscal year 2007-2008, year when the DIA was executed, it reported a deficit of overall revenues over expenditures of close to two million dollars, before considering the input of funds coming from emission of debt.  (See Docket No. 37-6.) During the fiscal year 2008-2009, a year after the DIA was executed, the Municipality reported a deficiency in overall revenues over its expenditures of close to four million dollars.  (See Docket No. 37-7.)

Thereafter, on April 5, 2010, PRB notified the Municipality that "the current members of PRB intend[ed] to transfer all of their ownership interests in [PRB]" to Simon Property Group, L.P. who would "indirectly own and control 100% of [PRB]."  Id. (Docket No. 33-5.)  Said letter noted that the incentive grant under the DIA "shall be paid to [PRB] from the portion of the municipal sales tax derived from gross sales receipts of tenants of Phase II at Barceloneta."  Id.

7

Civil No. 13-1264 (GAG)

(emphasis added.)   The purpose of the letter was to notify the Municipality this intent to transfer

membership interests and request the Mayor's approval for the transfer of the DIA and another Tax

Decree.  Id.  On April 15, 2010, the Mayor sent a letter to PRB's counsel approving the transfer.

(Docket 33-6.)

In May, 2010, the Municipality made one incentive grant payment to PRB under the DIA

in the amount of $211,494.00.   (Docket No. 33 at 3.)   Since then, it has not made any other

payments under the DIA.  Id.

Then, on August 8, 2011, the Puerto Rico Comptroller issued an Audit Report of the

Municipality's fiscal operations for the period of January 1, 2006 to December 31, 2009 to

determine whether these were carried out in accordance with applicable laws and regulations.[4]

(See Docket No. 54-1.)   Pertinent here, the Puerto Rico Comptroller investigated the execution of

the DIA, and "[m]unicipal ordinances passed to grant a company a Municipal Sale and Use Tax

economic incentive."  See id. at 17.  As to the DIA, the Puerto Rico Comptroller made various

findings of deficiencies and issued various recommendations to the Municipality.  In relevant part,

the Puerto Rico Comptroller found:

1. The Municipality had an accumulated deficit in the Operational Fund of fiscal year
   2008-2009 of $3,705,542.  Id.  at 12.

2. The Municipality incurred in overdrafts in the amount of $4,660,516 in 57 of the total
   budget items for fiscal years 2007-2008 and 2008-2009.  Id.

3. The Municipality authorized purchases and disbursements, knowing that it lacked the
   credit and the funds to pay them.  Id.

---

[4] Section 22 of Article III of the Constitution of the Commonwealth of Puerto Rico states that: "[t]he Controller shall audit all the revenues, accounts and expenditures of the Commonwealth, of its agencies and instrumentalities and of its municipalities, in order to determine whether they have been made in accordance with law."  P.R. Const. art. III, § 22.  Pursuant to the Constitution of Puerto Rico and Act 81, the Puerto Rico Comptroller may conduct "audit of the activities, transactions or operations of a municipality at any time."  P.R. Const. art. III; § P.R. Laws Ann. tit. 21, § 4004.

Civil No. 13-1264 (GAG)

4. The Municipality's Municipal Legislature, through Ordinance 12, authorized the Mayor to sign the DIA to grant PRB an economic incentive.  Id. at 17.

5. The Municipality entered into an agreement (the DIA) with a private company (PRB), and as set forth therein, the Municipality would grant it a $3,000,000.00 incentive effective on the date the stores began to operate.  Id.

6. The incentive grant would come from 50 percent (50%) of the Municipal Sales and Use Tax collected from the sales of the stores.  Id.

7. The Municipal Legislature does not have the power to authorize the Mayor to enter into agreements that authorize uses not contemplated by law for Sales and Use Tax collections.  Id. at 18.

8. By granting $3,000,000.00, the Municipality will lose three million dollars of revenue from the Sales and Use Tax collections to a private entity, which shall produce consequent adverse effects on its finances and services to its citizens.  Id. at 21.

9. The Mayor and the Municipal Legislature did not protect the interests of The Municipality and assumed powers not contemplated in the law.  Id.

(See Docket No. 54-1 at 17-18, 21.)   The Puerto Rico Comptroller found the DIA was not authorized by law and cited Article VI, Section 9 of the Constitution of Puerto Rico, which states: "[p]ublic funds and properties shall only be disposed of for public purposes and to support and operate the institutions of the State and always through legal authority."   Id.   The Puerto Rico Comptroller also concluded that pursuant to law "no public officer shall use the duties and powers of his position, or public funds or property, to obtain, directly or indirectly, for him or herself, or any member of his or her family unit, or any other person, business or entity, advantages, benefits or privileges not permitted under the law."  (See id. at 17.)

The Puerto Rico Comptroller found the DIA to be in contravention of Law No. 120 of October 31, 1994, as amended, the Puerto Rico Internal Revenue Code of 1994 (the "Puerto Rico Code"), specifically its subsection (b) of Section 6189 (Use of the Tax and Collection and Levy of

9

**Civil No. 13-1264 (GAG)**

the Tax), which reads states that one percent (1%) of the monies proceeding from the imposition of the sales and use tax to be collected by municipalities <u>shall be used for solid waste collection and recycling programs, the construction of capital works and improvements, health and security</u>.  P.R. LAWS ANN. tit. 13, § 8189 (emphasis added.)  The Puerto Rico Comptroller also found the DIA in contravention of subsection (c) of Section 6189 (Collection and Levy of Tax) which states that the municipalities who choose to make the collections on their own or through agreements with private companies <u>shall withhold all proceeds from municipal sales and use tax collections for their own benefit</u>, specifically the one (1) percent sales and use tax collected by municipalities.  <u>Id.</u> (emphasis added).

The Mayor and President of the Municipal Legislature issued their comments and allegations as to the above findings and conclusions by the Puerto Rico Comptroller.  (Docket No. 54-1 at 21-22.)  Having considered them, the Puerto Rico Comptroller determined that her findings prevailed and that the authorization, execution and obligations under the DIA, and the municipal ordinances approved in connection therewith, are contrary to applicable law and the Constitution of Puerto Rico.   (<u>See id.</u> at 22.)   In turn, the Puerto Rico Comptroller issued various recommendations, i.e., that the Municipality refrain from authorizing payments to PRB pursuant to the DIA, and that the Municipality should collect from PRB any amount paid thereunder.  <u>Id.</u> at 9.  Further, the Puerto Rico Comptroller recommended that the Municipality should ensure that funds from the Municipal Sales and Use Tax are used exclusively for the purposes specified in the Puerto Rico Code, as amended.   <u>Id.</u>   Finally, she recommended that the Municipality implement an austerity plan.  <u>Id.</u> at 7.  Following the Puerto Rico Comptroller's directives, the Municipality did not make any further payments under the DIA.  (<u>See</u> Docket No. 50-1 at 4.)

Civil No. 13-1264 (GAG)

On November 21, 2011, in compliance with Ordinance 28, PRB notified the Municipality that it intended to merge with Plaintiff and the surviving entity would be Plaintiff.  (Docket No. 33-7.)  PRB thus requested the Mayor's approval to transfer the DIA to Plaintiff.  Id.  The letter also requested the Mayor to confirm that such merger and transfer would not affect the terms and conditions of the DIA.  Id.

On December 14, 2011, PRB merged with and into Plaintiff, with Plaintiff being the sole surviving entity. [5]  (See Docket Nos. 49-3; 49-4; 49-5.)  On March 6, 2012, upon review of the November 21, 2011 letter, the Municipality refused to authorize the transfer of the DIA to Plaintiff because, among other things, the Puerto Rico Comptroller found in its Audit Report that the DIA was void under the law and recommended that the Municipality abstain from authorizing payments thereunder.  (See Docket No. 33-8.)

---

[5] The parties dispute whether the merger in fact occurred.  (See Docket Nos. 50-1 at 3; 37-1 ¶¶ 97-100.)  On one side, the Municipality challenges the merger's uncontested status because Plaintiff did not produce any evidence in the complaint nor during discovery to attest its materialization.  Id.  (See also Docket No. 37 at 6-7.)  The Municipality argues that it requested all documents related to, in furtherance of, and demonstrating the merger, but that Plaintiff objected to producing them by indicating that the request was overboard, vague and/or irrelevant and that some documents were confidential and/or contained privileged information.  Id.  (See also Docket Nos. 49-1 at 20, 25; 70 at 24.)  The Municipality pressed the issue but claims its attempts were futile.  (Docket No. 37 at 6-7.)  On the other side, Plaintiff accepts it had the burden to prove the existence of the merger and, asserts that in response to the Municipality's summary judgment motion and accompanying statement of material facts it finally "set forth additional evidence that plainly establishes that the merger indeed took place" and that its occurrence is now "beyond dispute."  (Docket No. 49 at 4-5.)  The court notes that one of the documents which Plaintiff produced to attest that the merger took place (Docket No. 49-2) is an affidavit by Megan Magyery, which the court will address infra in part III.A. of this opinion.  As such, the Municipality claims that the merger evidence was produced in violation of the evidentiary discovery rules; and, therefore, Plaintiff cannot rely on it to oppose summary judgment.  (Docket No. 70 at 24, 27.)  It is clear that Plaintiff evidenced the merger with documents they had refused to produce during discovery.  This shows that the requested information was readily obtainable, relevant, not vague, nor confidential.  The court cannot stress enough the importance of good faith discovery and reminds the parties that disclosing evidence for the first time at the summary judgment stage, and without justification, is sanctionable and directly violates Fed. R. Civ. P. 26(a) and (e).  Strictly construing Rule 26, and pursuant to Fed. R. Civ. P. 37(c), the court would ordinarily strike evidence that was untimely disclosed without proper justification.  However, the court need not do so here because, as the court will address below, the issue of the merger is not dispositive to the court's holding.  Consequently, the court will not delve into the merits of these contentions but, nevertheless, cautions the parties to abstain from this practice.

Civil No. 13-1264 (GAG)

On May 8, 2012, Plaintiff sent a default letter to the Municipality wherein it requested that the Municipality reconsider its decision not to transfer the DIA to Plaintiff and demanded the Municipality to pay the total outstanding amount due as of March, 2012.  (Docket No. 33-9.)  On December 20, 2012, Plaintiff sent another default letter to the Municipality.  (Docket No. 33-10.)  Finally, on April 2, 2013, Plaintiff filed the present action.  (Docket No. 1.)

**III. Discussion**

A. Subject Matter Jurisdiction

As a threshold matter, the court first examines the jurisdictional challenge to diversity raised by the Municipality.  (Docket No. 37 at 3.)  The objection that a federal court lacks subject matter jurisdiction may be raised by a party, or by a court on its own initiative, at any stage in the litigation.  Arbaugh v. Y & H Corp., 546 U.S. 500, 506 (2006).  The Municipality contends that the complaint should be dismissed for lack of subject matter jurisdiction because it is premised on diversity jurisdiction and Plaintiff failed to meet its burden of demonstrating the existence of such jurisdiction because it failed to assert that all its members, including limited partners, are completely diverse.  (Docket No. 37 at 3-4.)  "It is black-letter law that jurisdiction must be apparent from the face of the plaintiff's pleading," Viqueira v. First Bank, 140 F.3d 12, 18 (1st Cir. 1998), and the Municipality argues that in this case it is not.  A straightforward reading of the complaint only points to a general statement attesting to the court's federal jurisdiction, which specifies that Plaintiff is a limited partnership duly organized under the laws of Delaware, registered to conduct business in Puerto Rico, and "is comprised solely of partners that are not citizens of Puerto Rico."  (Docket No. 1 at 1.)  As such, the Municipality argues that Plaintiff did not establish diversity jurisdiction, which is fatal to its complaint.  (Docket No. 37 at 3-4.)

**Civil No. 13-1264 (GAG)**

For purposes of diversity jurisdiction, to determine the citizenship of an unincorporated association, such as a limited partnership, it is a well-established rule that a federal court must look to the citizenship of a partnership's limited, as well as its general partners.  See C.T. Carden v. Arkoma Assocs., 494 U.S. 185, 192-195 (1990) (stating that "[w]e have never held that an artificial entity, suing or being sued in its own name, can invoke the diversity jurisdiction of the federal courts based on the citizenship of some but not all of its members"); D.B. Zwirn Special Opp. Fund, L.P. v. Mehrotra, 661 F.3d 124, 127 (1st Cir. 2011) (To determine whether the complaint was sufficient to support diversity jurisdiction, the court ordered plaintiff to include a statement tracing the citizenship of "any member that is an unincorporated association through however many layers of members or partners there may be.")   Moreover, in diversity jurisdiction, to establish the citizenship of a corporation, the court must look to the place of incorporation of the corporate entity, as well as any state where it has its principal place of business.  See 28 U.S.C.A. § 1332(c)(1)  ("[A] corporation shall be deemed to be a citizen of any State by which it has been incorporated and of the State where it has its principal place of business.") (emphasis added).

It is thus clear that Plaintiff did not make apparent the existence of federal jurisdiction from the face of its complaint and failed to offer evidence to confirm its general statement that no partner is a citizen of Puerto Rico.  As such, the Municipality first raised the lack-of-diversity issue in its Answer to Complaint and, again, during discovery.  (Docket No. 37 at 5.)  Nevertheless, Plaintiff did not move to amend the complaint or otherwise attest its diverse status.   The Municipality also avers that during discovery, in an effort to determine whether jurisdiction existed, it requested Plaintiff to provide a list of all its partners at every layer of ownership, and to include their identity and citizenship.  Id.  Moreover, the Municipality avers that Plaintiff's responses to these inquiries were insufficient and that it did not provide all the necessary

Civil No. 13-1264 (GAG)

information to complete the diversity jurisdiction assessment.  Id.  It specifically avers that Plaintiff did not offer the true citizenship of one of its partner, Simon PC, Inc., and that in its answer to interrogatories, it simply stated that it was a Delaware corporation.  Id.  The Municipality then requested Simon PC, Inc.'s principal place of business but Plaintiff did not produce it.  (Docket No. 70 at 32.)  The Municipality thus objects to Plaintiff's failure to produce said information.  (Docket No. 39-5.)

Plaintiff acknowledged the Municipality's objections, and vowed to review and answer as soon as possible.  (Docket No. 39-6.)  Plaintiff never supplemented its answers.  The Municipality claims that it continued to press the issue with Plaintiff, but its discovery efforts were futile.  (Docket No. 37 at 5-6.)  As such, the Municipality argues that it could not gauge the true citizenship of Simon PC, Inc., and, in turn, whether diversity jurisdiction existed.  Id.  Because Plaintiff failed to meet its burden of establishing federal jurisdiction, the Municipality claims that the case should be dismissed for lack of federal jurisdiction.  Id.

In response to the Municipality's lack-of-diversity-jurisdiction argument, Plaintiff replies that the location of Simon PC, Inc. had been inadvertently omitted from Plaintiff's responses to discovery but that such information was now being supplied in its opposition to summary judgment.  (Docket No. 49 at 4.)  Notably, Plaintiff responded that: "pertinent information completing the only 'minor gap' that remained in the process of confirming the existence of diversity jurisdiction has been submitted with this response."  (Docket No. 49-1 at 26.)  While Plaintiff's omission from its responses to the Municipality's inquiries might have been an oversight, the court notes that it is concerned by Plaintiff's laid-back approach to its federal jurisdiction, especially given that "if a plaintiff's claim of diversity is challenged, the plaintiff has the burden of proof."  Thomson v. Gaskill, 315 U.S. 442, 446 (1942); Hawes v. Club Ecuestre, 598

14

Civil No. 13-1264 (GAG)

F.2d 698, 702 (1st Cir. 1979); <u>Calderon-Serra v. Wilmington Trust Co.</u>, 715 F.3d 14, 17 (1st Cir. 2013) (holding that when a defendant moves to dismiss for lack of federal subject matter jurisdiction, "the party invoking the jurisdiction of a federal court carries the burden of proving its existence." (citing <u>Murphy v. U.S.</u>, 45 F.3d 520, 522 (1st Cir. 1995)).

Further, Plaintiff's "minor gap" response suggests that it is undisturbed by the fact that it supplied the missing puzzle piece to establish federal jurisdiction, <u>for the first time</u>, in opposition to the Municipality's motion for summary judgment.  (Docket Nos. 49 at 4; 49-1 at 26.)  The court cannot remain silent as to these "devil-may-care" efforts.  Federal jurisdiction is not a "minor" issue.  Rather, it is a matter of first order.  "After all, if the court lacks subject matter jurisdiction, assessment of the merits becomes a matter of purely academic interest," <u>Deniz v. Mun. of Guaynabo</u>, 285 F.3d 142, 150 (1st Cir. 2002), and as a court of limited jurisdiction, this court "may not presume the existence of subject matter jurisdiction, but, rather, must appraise [its] own authority to hear and determine particular cases."  <u>See</u> <u>Cusumano v. Microsoft Corp.</u>, 162 F.3d 708, 712 (1st Cir. 1998).

What is more, Plaintiff proposes to cure the diversity jurisdiction "gap" through a sworn statement by Megan Magyery, a Litigation Paralegal for Simon Property Group, Inc., in which she states that the principal offices of Simon PC, Inc. are located in Indianapolis, Indiana.  (<u>See</u> Docket No. 49-2.)  It is worth noting that this affidavit was signed the same day that the opposition to the Municipality's summary judgment motion was filed.  <u>See</u> <u>id.</u>  The Municipality, in turn, challenges Plaintiff's reliance on Ms. Magyery's affidavit for various reasons.  First, Ms. Magyery was not disclosed as an individual with knowledge of the facts relevant to this case in Plaintiff's Rule 26 disclosures.  (<u>See</u> Docket No. 70 at 30, 33.)  Second, she was not disclosed in Plaintiff's Answer to Interrogatories' list of all individuals with knowledge.  <u>See</u> <u>id.</u>  The Municipality also argues that

Civil No. 13-1264 (GAG)

pursuant to Fed. R. Evid. 37(c), Plaintiff cannot rely on this affidavit because the witness and information contained therein cannot be produced for the first time at summary judgment when the Municipality did not have the opportunity to weigh its veracity.  Id. at 33.

Plaintiff justifies its disclosure of key information at this late stage by stating that because the Municipality announced these and other discovery issues via prior Emergency motion and said it planned to raise the issue of diversity jurisdiction in its motion for summary judgment, Plaintiff assumed that "the process of preparing a response that would have led to a meet-and-confer to discuss the pending objections to discovery became moot."  (Docket No. 49-1 at 26.)  Contrary to Plaintiff's assertion, the Municipality's request for information concerning the existence of jurisdiction did not "become moot" when it filed its summary judgment.  As noted above, the inquiry into a federal court's subject matter jurisdiction may be raised at any stage in the litigation.  See Arbaugh, 546 U.S. at 506.  Moreover, the court notes that the asked about information (principal place of business of Simon PC, Inc.) should be readily available to Plaintiff and it should have been produced the first time the Municipality asked for it.  More so, Plaintiff had the burden to diligently disclose, given that the Municipality sought this information to determine whether diversity jurisdiction existed.  Instead, proof of complete diversity was finally produced in a self-serving affidavit, offered for the first time in response to summary judgment, by an undisclosed individual with personal knowledge.  This is untenable because it is well-established that once jurisdiction is challenged, the plaintiff bears the burden of supporting his allegations of jurisdiction with competent proof.  See O'Toole v. Arlington Trust Co., 681 F.2d 94, 98 (1st Cir. 1982).

Furthermore, Plaintiff violated the discovery rules by not disclosing Ms. Magyery as "an individual likely to have discoverable information," as required under Rule 26.  See Fed. R. Civ. P. 26(a)(1)(A)(i) (requiring a party, without awaiting a discovery request, to "provide to the other

Civil No. 13-1264 (GAG)

parties . . . the name and telephone number of each individual likely to have discoverable information—along with the subjects of that information—that the disclosing party may use to support its claims or defenses.") That obligation is a continuing one.  See FED. R. CIV. P. 26(e)(1)(A) (requiring a party to supplement its disclosure promptly "if the party learns that in some material respect the disclosure or response is incomplete or incorrect, and if the additional or corrective information has not otherwise been made known to the other party."); Harriman v. Hancock Cnty., 627 F.3d 22, 29 (1st Cir. 2010).

If Plaintiff intended to rely on Ms. Magyery's affidavit to supply evidence, it had a duty to promptly disclose her as an individual with discoverable evidence, which it intended to use to support its claim of complete diversity.  See FED. R. CIV. P. 26(a) and (e).  If a party fails to disclose information under Rule 26(a) or (e), pursuant to Rule 37(c), said party  "shall not . . . be permitted to use as evidence . . . any witness or information not so disclosed."  FED. R. CIV. P. 37(c).  See Sheek v. Asia Badger, Inc., 235 F.3d 687, 693 (1st Cir. 2000) (the continuing duty to disclose promotes the broader purpose of discovery, which is "the narrowing of issues and the elimination of surprise"); see also Thibeault v. Square D Co., 960 F.2d 239, 244 (1st Cir. 1992) (emphasizing that this court attempts "to ensure that the spirit of open discovery embodied in Rule 26 is not undermined either by evasion or dilatory tactics").

The court agrees with the Municipality that this late disclosure is not a harmless inconvenience, mainly because the Municipality was not able to assess the veracity of the statements in Ms. Magyery's affidavit and conduct its own jurisdiction assessment.  In the Municipality's own words, "this is the equivalent of litigation by ambush" and should not be allowed because Plaintiff "pretends that Defendant raise its hand and admit jurisdiction at this

**Civil No. 13-1264 (GAG)**

stage when it never had the opportunity to conduct discovery on it."  (See Docket No. 71 at 5.) Accordingly, the prejudice to the Municipality is substantial.  See Harriman, 627 F.3d at 31.

When faced with a discovery violation, the district court "possesses wide latitude in formulating the appropriate sanction." Sheek v. Asia Badger, Inc., 235 F.3d 687, 694 (1st Cir. 2000) (citing Poulin v. Greer, 18 F.3d 979, 984 (1st Cir.1994)).  Failure to comply with disclosure obligations can have severe consequences.   Rule 37 authorizes district courts to sanction noncomplying parties, and, although sanctions can vary depending on the circumstances, "[t]he baseline rule is that 'the required sanction in the ordinary case is mandatory preclusion.'" Santiago-Diaz v. Lab. Clinico Y De Referencia Del Este, 456 F.3d 272, 276 (1st Cir. 2006) (quoting Lohnes v. Level 3 Commc'ns, Inc., 272 F.3d 49, 60 (1st Cir. 2001)); see Fed. R. Civ. P. 37(c)(1).[6]

Despite the fact that the Magyery affidavit does not directly contradict Plaintiff's prior statements, which would deem it a "sham affidavit," it is nevertheless a post-summary judgment self-serving affidavit used to evidence allegations that Plaintiff had failed to prove.  This makes a mockery out of Rule 26 and the discovery process.  This is aggravated given that the information that Plaintiff omitted to disclose pertains to the court's jurisdiction.  Citing the above Federal Rules of Civil Procedure, the Municipality argues in favor of disallowing said affidavit.  Without a satisfactory explanation as to why Ms. Magyery and the information concerning Simon PC, Inc. were not disclosed until now, under strict construction of the rules, mandatory preclusion should be the appropriate remedy.  If precluded, Plaintiff could not prove that diversity jurisdiction exists.

---

[6]  The First Circuit consults an array of factors when reviewing preclusion decisions.  Harriman, 627 F.3d at 30.  They include the sanctioned party's justification for the late disclosure; the opponent-party's ability to overcome its adverse effects (i.e., harmlessness); the history of the litigation; the late disclosure's impact on the district court's docket; and the sanctioned party's need for the precluded evidence.  See id.; Esposito v. Home Depot U.S.A., Inc., 590 F.3d 72, 76 (1st Cir. 2009) (citing Macaulay v. Anas, 321 F.3d 45, 51 (1st Cir. 2003)).

Civil No. 13-1264 (GAG)

1       While Ms. Magyery's affidavit to fill the "minor gap" establishing diversity jurisdiction

2 should be precluded, from the court's perspective, it would be a waste of the parties' and the

3 court's resources to do that. This is a delicate matter, but the court, mindful of its judicial

4 resources and time already spent examining the parties' arguments in this case, weighs its decision

5 by considering the stage of the proceedings, the fact that both parties filed significant cross-

6 motions for summary judgment and oppositions thereto, and the implications of precluding this

7 evidence. The court could dismiss the case for lack of diversity jurisdiction given Plaintiff's

8 evidentiary "oversight." This, however, would most likely prove futile because Plaintiff could

9 simply re-file the case and confirm, this time in a timely manner and in its initial pleading, the

10 existence of jurisdiction. The court also considers the fact that the Municipality does not contest

11 the information provided by Plaintiff—the place of business of Simon PC, Inc.—but argues that

12 Plaintiff cannot use said information pursuant to Rule 37. As such, Plaintiff will get by with a "get

13 out of jail free card" with respect to this issue.

14       The Supreme Court has avoided deciding a jurisdictional issue by assuming that

15 jurisdiction existed for the purpose of that case.[7] Because this case may be disposed of in favor of

16 the party raising the want-of-jurisdiction argument on other grounds, and because the jurisdiction

17 issue falls on Plaintiff's technical discovery flub, which it purports to have cured, the court

18 assumes that jurisdiction was established. See U.S. v. Augenblick, 393 U.S. 348, 349-352 (1969)

19 (making the assumption, without deciding, that jurisdiction in this cause was established). The

20 situation here moves the court to agree that "even on questions of a court's adjudicatory authority

21

22       [7] In Norton v. Mathews, 427 U.S. 524, 532, (1976), for example, the Court stated: "It . . . is evident that,

23 whichever disposition we undertake, the effect is the same. It follows that there is no need to decide the theoretical question of jurisdiction in this case. In the past, we similarly have reserved difficult questions of our jurisdiction when the case alternatively could be resolved on the merits in favor of the same party." See also

24 Sec. of the Navy v. Avrech, 418 U.S. 676 (1974).

Civil No. 13-1264 (GAG)

in particular, salvage operations are ordinarily preferable to the wrecking ball." <u>Grupo Dataflux v.</u> <u>Atlas Global Grp.</u>, 541 U.S. 567, 592 (2004).  (Ginsburg, J., dissenting).  To decide otherwise would be a waste of the court's, as well as the parties', time and resources.

The court thus **DENIES** the Municipalities' request to dismiss this case for lack of diversity jurisdiction and now turns to the merits of the cross-motions for summary judgment.

As a final note, Plaintiff's attorneys are well aware of the discovery rules and governing case law; therefore, the court expects counsel to abide said rules and precedent accordingly.  As such, this court will address via separate order the issue of appropriate sanctions to Plaintiff's counsel for its discovery violations.

    B.  <u>The validity of the DIA</u>

Before diving into the legal analysis, the court will discuss the parties' arguments in depth. The Municipality claims that the complaint should be dismissed because the DIA is illegal, null and void.  (Docket No. 37.)  It first argues that, by providing that the three million dollar incentive grant payable to PRB would be paid with revenues generated from the Municipal Sales and Use tax (hereinafter "IVUM" for its Spanish acronym) collections, levied on sales by tenants of the Phase II stores of the mall, the DIA illegally committed public funds, which, according to various sections of the Puerto Rico Code, as amended in pertinent part by Act No. 117 of July 4, 2006 and Act No. 80 of July 29, 2007 ("Act 80"), can only be committed and used for the limited public purposes stated therein.  (<u>See</u> Docket No. 37 at 2-8.)

The Municipality declares that Section 6189—Municipal Imposition of the Sales and Use Tax of Act 80—P.R. LAWS ANN. tit. 13, § 8189[8], which, in pertinent part, amended Section 6189

---

    [8]  The 1994 Puerto Rico Code was repealed and amended by Act No. 1 of Jan. 31, 2011 (the 2011 Puerto Rico Internal Revenue Code), P.R. LAWS ANN. tit. 13, §§ 30001 *et seq*.  Section 6189 was, in turn, amended by this law and is current at P.R. LAWS ANN. tit. 13, § 33344—Municipal imposition of sales and use tax.

**Civil No. 13-1264 (GAG)**

1    of Act No. 120 of October 31, 1994 (the 1994 Puerto Rico Internal Revenue Code), imposed

2    restrictions on how the municipalities can spend the monies collected from the IVUM and

3    specifies that those uses are solid waste collection and recycling programs, the construction of

4    capital works and improvements, health and security.  Id. at 8.  In other words, it argues that the

5    Puerto Rico Code enumerates, in an exhaustive manner, the uses the municipalities may give to the

6    funds derived from the IVUM, and that paying a direct grant of three million dollars to a private

7    entity for the expansion of a mall is not one of them.  Id. at 9.  The Municipality thus argues that

8    the use of IVUM revenues for that purpose was illegal; and, therefore, the DIA is contrary to

9    applicable legislation.  Id.  Moreover, in approving municipal ordinances to allow the execution of

10   the DIA and by executing the DIA itself, the Mayor acted in an *ultra vires* manner.  Id. at 10.  As

11   such, the DIA is null, void and unenforceable, even if Plaintiff relied on it.  Id.  The Municipality

12   also posits that this is an inevitable conclusion because it is consistent with the findings and

13   holdings of the Puerto Rico Comptroller, who scrutinized the DIA and found it to be illegal and

14   void for these and other reasons explained in its Audit Report.  (See Docket No. 54-1.)

15           Although the Municipality claims that the language of the DIA clearly encompasses an

16   illegal use of IVUM funds, which renders it null, Plaintiff reads the DIA in a different light and

17   reiterates that it does not require the Municipality to pay the incentive grant from revenues

18   collected from the IVUM.  (Docket No. 49 at 7.)  Plaintiff contends that the incentive grant

19   payable to PRB under the DIA, which it argues should now be paid in its favor, "shall be pa[id] to

20   [PRB] from the general funds" of the Municipality.  (See id.)  Plaintiff further contends that when

21   the DIA states that the Municipality "shall remit [PRB] and amount equal to fifty percent (50%) of

22   all sales taxes generated from the gross sales of the tenants," it only refers to the method of

23   calculating monthly payments because the origin of the funds was already clearly defined, as

24

**Civil No. 13-1264 (GAG)**

coming from the general funds.  (See id. at 8.)  Therefore, the DIA is legal, valid and enforceable because it does not require the Municipality to pay the incentive grant from funds collected under the IVUM, but from general municipal funds.  Id.  In turn, Plaintiff claims that given the unequivocal language of the DIA, the restrictions imposed by the Puerto Rico Code to the use of IVUM revenues, which the Municipality avers make the DIA illegal, are simply inapplicable or irrelevant. Id.

In addition, Plaintiff submits that while the Municipality champions the Puerto Rico Comptrollers' findings, its analysis and conclusions are flawed because a comprehensive reading of the Puerto Rico Code shows that the uses of the IVUM included in Section 6189 are not taxative or mandatory, but rather, permissive.  Id. at 9.  Finally, Plaintiff contends that even if the incentive grant came from IVUM collections, there is no clear statutory language that prohibits such a payment because the list contained in Section 6189 is not exhaustive.  Tit. 13, § 8189.  In addition, Plaintiff posits that the "supposed" restrictions on the use of IVUM revenues imposed by Sections 2706-2709[9] of the Puerto Rico Code, P.R. LAWS ANN. tit. 13, §§ 9095e-h, which, in pertinent part, were added to Act No. 120 of October 31, 1994 (the 1994 Puerto Rico Internal Revenue Code) through Act 80, are also irrelevant.  Id. at 8-9.  In support of this alternative argument, Plaintiff avers that the Municipality approved Ordinance No. 24 (Series 2006-2007) ("Ordinance 24"), which provides that the funds collected from the imposition of the IVUM may be used for certain purposes, but protects its fiscal autonomy by not limiting it to strict uses.  (Docket No. 48.) Therefore, even if the incentive grant under the DIA is payable with IVUM revenues, neither the Puerto Rico Code nor municipal ordinances restrict the use of funds generated under the IVUM; so, the DIA is valid.  Id. at 9-10.

---

[9] These sections were amended by the 2011 Puerto Rico Internal Revenue Code and are current at P.R. LAWS ANN. tit. 13, §§ 32126-32129.

Civil No. 13-1264 (GAG)

To summarize the parties' contentions, the Municipality argues that the DIA is contrary to applicable Puerto Rico law because it requires it to pay PRB an incentive grant with monies generated from IVUM collections, which, in turn, makes the DIA null and void, leaving Plaintiff without recourse.  Plaintiff challenges this proposition saying that the incentive grant is payable from the Municipality's general funds and not IVUM revenues, and, in the alternative, that the Puerto Rico Code's restrictions on the IVUM uses are inapplicable and not mandatory.

1.  *The language of the DIA.*

In short, the issue here is whether the DIA is a valid, binding contract between the parties. Because the crux of this matter lies in the language of the DIA, the court turns to its text.

The DIA clearly and unambiguously provides that the Municipality's authority to impose the IVUM derives from Section 6189 of the Puerto Rico Code, tit. 13, § 8189, which authorizes the municipalities to collect a sales and use tax on goods or services at a fixed rate of 1.5%, from which municipalities shall collect 1% and the Puerto Rico Department of Treasury shall collect 0.5% to be used in three municipal funds.  (See Docket No. 33-4 at 4.)  The DIA's recitals state that the Mayor opines that PRB should receive an additional incentive in the form of a "direct grant from general funds."  (Id. at 3.)  The recitals also state that the Municipality "has enough funds to cover its finances and deems it in its best interest that funds from [its] general funds generated from a portion of the municipal sales tax derived from the gross sales of tenants of Phase II be granted to [PRB]" to complete the development of Phase II.  Id. (emphasis added.)

Section 2.1 of the DIA indicates that the Municipality will grant PRB a three million dollar incentive grant paid from its general funds, and that the manner in which said grant would accrue in favor of PRB is established under Section 2.2.  (Id. at 4.)  Section 2.2, in turn, provides for the computation of the incentive grant and states that the Municipality "shall remit [PRB] an amount

23

**Civil No. 13-1264 (GAG)**

equal to fifty percent (50%) of all Sales Taxes (IVUM) generated from the gross sales of the

tenants of Phase II for any given taxable year." (Id. at 4-5.) (emphasis added.)  It also states that

the Municipality "shall then pay to [PRB] from [its] general funds . . . , an amount equivalent to

fifty percent (50%) of the aggregate amounts collected by the Municipality."   Id. (emphasis

added.)  It finally states that, in the case of any IVUM amounts reported by the tenants but not

collected by the Municipality, the Municipality "shall then pay [PRB], fifty percent (50%) of such

Sales Tax (IVUM) . . . collected by the Municipality."  Id. (emphasis added.)

      Turning to the applicable law on this matter, contracting parties will be bound by their

contractual obligations, which must be fulfilled in accordance with the terms of the agreement.

P.R. LAWS ANN. tit. 31, § 2994; Mercado-Salinas v. Bart Enterprises Int'l, Ltd., 852 F. Supp. 2d

208, 217 (D.P.R.) on reconsideration in part, 889 F. Supp. 2d 265 (D.P.R. 2012).  If the terms of a

contract are clear and leave no doubt as to the intentions of the contracting parties, then the literal

terms of the contract will be observed, tit. 31, § 3471, and "a court should not look beyond the

literal terms of the contract."  Vulcan Tools of P.R. v. Makita U.S.A., Inc., 23 F.3d 564, 567 (1st

Cir. 1994) (internal quotations omitted); see Mercado-Salinas, 852 F. Supp. 2d at 217.  "Under

Puerto Rican law, an agreement is clear when it can be understood in one sense alone, without

leaving any room for doubt, controversies or difference of interpretation."  Yordan v. Burleigh

Point, Ltd., 552 F. Supp. 2d 200, 203 (D.P.R. 2007) (citations omitted) (internal quotation marks

omitted).  To be clear, the contract has to be "sufficiently lucid to be understood to have one

particular meaning . . . ."  Pineiro v. Oriental Grp., No. 07-2068, 2014 WL 4729053, at *11-12

(Sept. 22, 2014); Entact Services, LLC v. Rimco, Inc., 526 F.Supp.2d 213, 221 (2007).

      Moreover, when interpreting contracts, it is critical that courts read its provisions in

relation to one another, giving unclear provisions the meaning which arises from considering all

24

Civil No. 13-1264 (GAG)

provisions together.  P.R. LAWS ANN. tit. 31, § 3475; <u>Pineiro</u>, 2014 WL 4729053, at *12; <u>Marina</u>

<u>Aguila v. Den Caribbean, Inc.</u>, 490 F. Supp. 2d 244, 248 (D.P.R. 2007).  The contract's

"stipulations 'should be interpreted in relation to one another, giving to those that are doubtful the

meaning which may appear from the consideration of them together.'" <u>Yordan</u>, 552 F. Supp. 2d at

204 (quoting tit. 31, § 3475); <u>Mercado-Salinas</u>, 852 F. Supp. 2d at 217.  Further, a court may state

the meaning of a contract on summary judgment if the agreement is clear on its face.  <u>Adria Int'l</u>

<u>Grp., Inc. v. Ferre Dev., Inc.</u>, 241 F.3d 103, 111 (1st Cir. 2001); <u>see</u> <u>Torres Vargas v. Santiago</u>

<u>Cummings</u>, 149 F.3d 29, 33 (1st Cir. 1998).

   The critical inquiry here is determining, pursuant to the DIA, where the money comes

from.  In other words, what is the true source of funding for the incentive grant as per the DIA's

terms?  Reading the DIA's provisions in relation to one another and considering the agreement as a

whole, the court finds that the DIA is clear and unambiguous on its face in that the Municipality

agreed to pay the incentive grant with funds generated from IVUM collections levied on by sales

from the tenants of Phase II of the outlet mall.  (Docket No. 33-4.)  The source of the incentive

grant payment and method in which the Municipality would pay PRB are clearly defined in the

DIA.  The DIA's recitals, as well as Section 2.2, clearly establish that the Municipality is

committing IVUM funds in order to pay the incentive grant.  Further, aside from repeating that the

DIA establishes that the Municipality "shall pay from the general funds," Plaintiff fails to contest

that the DIA clearly sets forth how the incentive grant shall accrue in favor of PRB.  A

comprehensive reading of the DIA indicates that it clearly compels the Municipality to pay the

incentive grant through monthly installments to PRB from money directly generated from IVUM

collections until the grant was paid in full.  The DIA is thus clear and unequivocal in that it

committed IVUM funds to pay PRB the development incentive grant.  Accordingly, "the literal

Civil No. 13-1264 (GAG)

terms of the contract will be observed." See tit. 31, § 3471; Mercado-Salinas, 852 F. Supp. 2d at 217. Because the DIA is clear, the court must not turn to the intention of the contracting parties or extrinsic evidence.[10]

Nevertheless, further bolstering the court's determination is a letter sent by Plaintiff's (and PRB's) counsel to the Municipality on April 5, 2010, which states that the incentive grant under the DIA "shall be paid to [PRB] from the portion of the municipal sales tax derived from gross sales receipts of tenants of Phase II at Barceloneta." (See Docket No. 33-5 at 2.) Further, this exact language is repeated by Plaintiff's counsel in another letter to the Mayor sent on November 21, 2011. (Docket No. 33-7 at 2.) More so, Ordinance 12, which authorized the Mayor to sign the DIA, clearly states that the DIA "develops an incentive plan so that the municipal sales and use tax generated from profits on sales from the expansion of [the mall] will be shared at 50% to be able to attract investors who will occupy the stores in the expansion." (Docket No. 1-2 at 2.) (emphasis added).

Plainly, the parties' understanding that the incentive grant is payable with IVUM revenues is apparent. Thus, even assuming, arguendo, that the DIA's terms are not clear, so the court would turn to the parties' intentions, the intention of the parties is evident—the incentive grant shall be paid from IVUM collections. See Yordan, 552 F.Supp.2d at 203 (D.P.R. 2007) (noting that the intention of the contracting parties shall prevail if the words in the contract appear contrary to the parties' evident intention); Mercado-Salinas, 852 F. Supp. 2d at 217 (providing that attention should be paid to the actions of the contracting parties, during and after entering into the

---

[10] "Once a court determines that the terms of a contract are sufficiently clear so that only one meaning is possible, the court cannot dwell on the 'alleged' intent of the parties at the time they entered into the contract." Fernández-Fernández v. Mun. of Bayamón, 942 F. Supp. 89, 94 (D.P.R. 1996).

**Civil No. 13-1264 (GAG)**

agreement, when assessing their intentions.)  As such, Plaintiff's position that the incentive grant payment would come from the general funds and not from funds collected under the IVUM fails.

The court's conclusion is further bolstered by the Puerto Rico Comptroller's reading of the DIA and her finding that the incentive grant "would come from 50 percent of the [IVUM] collected from the sales of these stores" and that the Municipality had not made any payments to PRB as of April 26, 2010 because it was "verifying the monthly IVUM collections from the stores." (Docket No. 54-1 at 17.)  Although the Puerto Rico Comptroller lacks the independent legal faculty to enforce her recommendations, as they lack a binding character, Asoc. Alcaldes v. Contralor, 176 P.R. Dec. 150, 163 (2009), her findings' are "upmost persuasive to the public servants that are subject to public scrutiny. . ." Id.  More so, the Puerto Rico Comptroller's investigations are "cloaked with the highest public interest and are directed to promote the healthiest administration of public funds." E.L.A. v. Cole, 1646 P.R. Dec. 608 (2005) (translation provided).

Accordingly, although not bound by her conclusions, the court takes the Puerto Rico Comptroller's findings from its Audit Report at face value and agrees with them.  The contractual language of the DIA is clear—the parties agreed that the incentive grant was to be paid with IVUM revenues.

### 2. *Applicable Legislation.*

#### i. The Puerto Rico Code and the Use of IVUM Funds

The parties do not just disagree on the interpretation of DIA's text; they also differ as to what the Puerto Rico Code and applicable laws state on the purpose and use of the IVUM revenues.  (Docket No. 37 at 8-11; 49 at 8-10.)  In other words, whether the Puerto Rico Code authorizes the Municipality to disburse its IVUM funds to pay PRB the development incentive grant is a contested issue.  The court thus turns to Plaintiff's alternative argument that even if the

27

Civil No. 13-1264 (GAG)

court finds that the DIA clearly provides that the Municipality is committing IVUM funds to pay

the incentive grant, which it did, the Puerto Rico Code does not limit the use of IVUM collections.

The DIA correctly states that the power of municipalities to impose the IVUM comes from

Section 6189 of the Puerto Rico Code, which was the current section at the time the DIA was

drafted.  (Docket No. 33-4 at 4.)  The DIA also points to Ordinance No. 24.  Id.  Section 6189—

Municipal Imposition of the Sales and Use Tax—in its subsection (a) states that the IVUM

contribution shall be for a fixed rate of 1.5% from which the municipalities shall collect 1%, and

the Secretary of Treasury shall collect exclusively .5% "to be used for the funds provided in

subsections (e)(1), (e)(2) and (e)(3) of Section 2706 for the purposes established in Sections 2707,

2708, and 2709, as it may apply.  Tit. 13, § 8189.  It also states that "[t]he municipalities may

adopt regulations in accordance with the herein provided through a municipal ordinance to such

effect."  Id. (emphasis added).  Section 6189(b)—Use of the Tax—defines the uses for the IVUM:

> The moneys proceeding from the imposition of the sales and use tax corresponding to the one percent (1%) to be collected by the municipalities shall be used for solid waste collection and recycling programs, the construction of capital works and improvements, health and security. Notwithstanding the above, none of the municipalities may use said funds for the payment of payrolls, nor for the payment of any type of expenses related to the same, such as employer contribution or payroll taxes, with the exception of payroll expenses related to the programs or projects mentioned in this subsection.
>
> The moneys proceeding from point five (.5) percent of the municipal sales and use tax to be collected by the Secretary shall be used in the proportions provided in subsections (e)(1), (e)(2), and (e)(3) of Section 2706 for the purposes established in Section 2707, 2708 and 2709, as it may apply.

Tit. 13, § 8189.[11]

---

[11] As noted, the 1994 Puerto Rico Code was repealed and amended by the 2011 Puerto Rico Internal Revenue Code, P.R. LAWS ANN. tit. 13, §§ 30001 et seq.  The current version of Section 6189, in its subsection (b) identically states: "The moneys originating from the sales and use tax imposed, corresponding to the one percent (1%) to be collected by municipalities shall be used in solid waste collection and recycling programs, the construction of capital works and improvements, healthcare and security."  Tit. 13, § 33344.

28

Civil No. 13-1264 (GAG)

The court notes that the DIA is silent as to whether the incentive grant would be payable from the 1% to be collected by the municipalities or the .5% to be collected by the Secretary of the Treasury.  Drawing on logic and the parties' arguments, the incentive grant payable to PRB would most likely be generated by IVUM revenues taken from the 1% to be collected by the municipalities.  The court, nevertheless, analyzes the uses prescribed for the IVUM revenues from both allocations.

There is little doubt that the uses for the funds collected under the IVUM imposed by the Puerto Rico Code corresponding to the 1% collected by the municipalities (and the 5% by the Secretary) are mandatory, rather than permissive.  It is axiomatic that the word "shall" has a mandatory connotation.  Claudio-De Leon v. Sist. Universitario Ana G. Mendez, 775 F.3d 41, 46-47 (1st Cir. 2014); see Jama v. Imm. & Customs Enforcement, 543 U.S. 335, 346 (2005) (contrasting the discretionary word "may" with the mandatory word "shall"); Rivera v. Centro Medico de Turabo, Inc., 575 F.3d at 17 n. 5 (including "shall" in a list of "typical mandatory terms"); Black's Law Dictionary 1585 (10th ed. 2014) (defining "shall" to mean "[h]as a duty to; more broadly, is required to" and explaining that it is used to express "the mandatory sense that drafters typically intend").  Certainly, the Puerto Rico Code's use of the word "shall" in Section 6189(b) is meant to impose restrictions on how the municipalities can spend and use the IVUM funds collected.  Contrary to Plaintiff's contention, the court finds that Section 6189 does not suggest certain uses for the monies collected.  Its forceful language circumscribes the uses of the 1% IVUM revenues to the programs listed therein—solid waste collection and recycling programs, construction of capital works and improvements, health and security.  This reading of Section 6189 is consistent with the mandatory sense attributed to the word "shall."

29

Civil No. 13-1264 (GAG)

1       Moreover, the mandatory nature of this section is evident by the drafters' use of less

2 exclusively limiting language in other sections of the Puerto Rico Code.  For example, the drafters

3 of the Puerto Rico Code use the term "may", as opposed to the term "shall" whenever they deem it

4 appropriate, like in Section 2707, tit. 13, § 9095(f), discussed below.  The use of less taxative

5 language is moreover evident with the inclusion of phrases such as "and in any activity or project

6 within the sound public administration of the municipality," included in the Municipal

7 Development Fund section (use of the monies) of the 2011 Puerto Rico Internal Revenue Code.

8 P.R. LAWS ANN. tit. 13, § 32127. [12]  This language was not included in the 1994 Puerto Rico Code.

9 See P.R. LAWS ANN. tit. 13, § 9095(f).  The relevant sections of the Puerto Rico Code which were

10 current at the time the DIA was executed did not include this less restrictive language, which

11 denotes the mandatory nature of its terms.

12       In addition, Section 6189's sentence following the list of programs for IVUM uses

13 reinforces this forceful reading by clarifying that the municipalities may use the funds for payroll

14 and related expenses, but those expenses may only be related to the programs or projects listed in

15 the prior sentence, i.e., solid waste collection and recycling programs, construction of capital

16 works and improvements, health and security.  Tit. 13, § 8189.  Thus, it is clear that Section 6189

17 includes a taxative list of programs for the municipalities' use of the IVUM funds.

18

19

---

20   [12]  § 32127—Municipal Development Fund-Creation, of the 2011 Puerto Rico Internal Revenue Code, in its subsection (g) reads:

21       Use of the moneys from the Municipal Development Fund—The moneys proceeding from the Municipal Development Fund distributed monthly to the municipalities . . . (c) **may be used** by the municipalities for solid waste collection and recycling programs; the construction of capital works and improvements; health and security, including the payment of payrolls and related expenses, such as employer contribution or payroll taxes; <u>and in any activity or project within the sound public administration of the municipality</u>, except for payroll and expenditures related to such programs or projects.

22

23 P.R. LAWS ANN. tit. 13, § 32127(g). (emphasis added).

24

Civil No. 13-1264 (GAG)

Section 6189(b)—Use of the Tax—also prescribes how the monies proceeding from the .5% of the IVUM to be collected by the Secretary shall be used.  It states that the .5% monies collected from the IVUM "shall be used in the proportions provided in . . . Section 2706 for the purposes established in Section 2707, 2708 and 2709." Tit. 13, § 8189. (emphasis added).  In turn, Section 2706(e), as amended, states that the .5% of IVUM "shall be used exclusively for the purposes indicated hereinafter." Tit. 13, § 9095(e) (emphasis added).  Section 2706—Special Disposition of Funds—also establishes that the .5% revenues generated shall be distributed and assigned to three funds: the "Municipal Development Fund," created pursuant to Section 2707, the "Municipal Redemption Fund," created pursuant to Section 2708, and the "Municipal Improvement Fund," created pursuant to Section 2709.  Tit. 13, § 9095(e) (emphasis added).  Section 2706(g) also states that the "transfers or deposits of the moneys corresponding to each one of the[se] special funds . . . shall be immediately transferred to the Bank as soon as the same are collected . . . shall not be used by the Secretary for any other purpose." Tit. 13, § 9095(e) (emphasis added).

In pertinent part, Section 2707(e)—Use of the moneys proceeding from the Municipal Development Fund—states that "the moneys proceeding from [said] fund distributed monthly to the municipalities may be used for solid waste collection and recycling programs, the construction of capital works and improvements, health and security."[13] Tit. 13, § 9095(f) (emphasis added).  Section 2708(b) provides that the "moneys deposited in the Municipal Redemption Fund shall be used by the Bank exclusively for the granting of loans in favor of the municipalities" and that the

---

[13]  The court notes this section uses the word "may," as opposed to the mandatory term "shall."  As such, the list included in said section for the percentage allocated for the Municipal Development Fund, which pursuant to section 2707(e) corresponds to .2% of the .5% authorized, could be read to include other programs than those listed therein.  Nevertheless, this is irrelevant to our discussion because the DIA does not state, and Plaintiff does not argue, that the incentive grant payable to PRB would only come from this sum certain (.2%), which is a small fraction compared to the remaining 1.3% of IVUM revenues.

Civil No. 13-1264 (GAG)

"moneys proceeding from [said] fund made available to the municipalities through loans shall be used for solid waste collection and recycling programs, the construction of capital works and improvements, health and security." Tit. 13, § 9095(g) (emphasis added).  Finally, Section 2709 provides that the Municipal Improvement Fund will be distributed through legislation . . . to be appropriated for capital works and improvements projects in the municipalities. . . ." Tit. 13, § 9095(h).

Similar to the strict uses prescribed for the 1% of the IVUM revenues in the Puerto Rico Code, the same is required for the remaining .5% to be used for the three municipal funds. Sections 2706-2709 are clear in defining the purposes and uses of the .5% IVUM funds, and the language included therein is mandatory rather than permissive.  A strict reading of Section 2706 makes clear that the monies collected under the IVUM corresponding to the .5% have to be transferred to the Government Development Bank for Puerto Rico and are not to be used for any other purpose than those prescribed by Sections 2707, 2708 and 2709 of the Puerto Rico Code. Tit. 13, § 9095e-h.

The court now addresses Plaintiff's arguments regarding this issue.  Plaintiff does not contest that Sections 2706-2709 impose restrictions on the uses the municipalities may give to the monies collected from IVUM.  Nevertheless, Plaintiff argues that the restrictions imposed by these sections are irrelevant given the unequivocal language of the DIA (that incentive grant would be paid from general funds).  (Docket No. 49 at 8.)  However, the court already found that the DIA is clear in establishing that the incentive grant is payable with money directly generated by IVUM revenues.  (See part III.B.1 of this opinion.)  Furthermore, Plaintiff's argument that the aforementioned sections of the Puerto Rico Code are irrelevant or inapplicable misses the mark because Plaintiff fails to show that the Puerto Rico Code authorizes the Municipality to pay a

**Civil No. 13-1264 (GAG)**

private entity a development incentive grant with monies generated from IVUM revenues, either corresponding to the 1% or .5% of the funds, for the expansion of a shopping mall.  The court further notes that its reading of the Puerto Rico Code's provisions on the uses of the revenues generated from the municipal IVUM is congruous with the Puerto Rico Comptroller's reading of the same.  Although not legally binding, the Puerto Rico Comptroller's findings are compelling and the court agrees with its conclusion that the Puerto Rico Code clearly sets forth and authorizes, in a restrictive and mandatory manner, the exclusive purposes and uses for the IVUM funds. (Docket No. 54-1 at 9, 18.)  The court also agrees with the Puerto Rico Comptroller that the incentive grant payment attempted under the DIA, although novel as Plaintiff points out, is contrary to law because it is outside the scope of the uses the Puerto Rico Code proscribes. Moreover, the court agrees with the Puerto Rico Comptroller that "the municipal legislature does not have the power to authorize the Mayor to enter into agreements (referring to the DIA) that authorize uses not contemplated by law for IVUM collections."  (Docket No. 54-1 at 18.)

In conclusion, the Puerto Rico Code does not grant the municipalities a *carte blanche* to allocate its IVUM revenues.  By committing municipal IVUM funds for the payment of an incentive grant to PRB, the DIA authorized an illegal pay-out of public monies.  To be exact, the DIA sanctioned an unauthorized use of IVUM revenues in violation of the above cited Sections of the Puerto Rico Code.  More so, by approving certain municipal ordinances and executing DIA in contravention of applicable legislation, the Mayor and municipal legislature acted contrary to law and outside the scope of their authority.  Because the DIA is illegal, for being contrary to the Puerto Rico Code, it inexorably follows that it is null and void.

Civil No. 13-1264 (GAG)

ii.   Autonomous Municipalities Act

Not only is the incentive grant under the DIA contrary to the Puerto Rico Code's provisions, it is also contrary to various sections of Act 81, also known as the Autonomous Municipalities Act, P.R. LAWS ANN. tit. 21, §§ 4001, *et seq*., which recognizes each municipality's juridical, economic and administrative autonomy so that it can effectively address the needs and the welfare of its inhabitants.  This autonomy, however, is subordinate to, and shall be exercised in accordance with, the Constitution of Puerto Rico.  (See id. § 4002, 4004.)  Municipal autonomy and the powers conferred to its officials and legislature is not unlimited—it is subject to the Constitution of Puerto Rico and its applicable laws.

Article 2.001(o) provides that the municipalities may:

> Exercise its legislative and executive powers in any matter of municipal nature, which will bring about the welfare of the community and its economic, social and cultural development; in the protection of the health and safety of the people; n encouraging civic action and the solidarity of the communities, and in the development of works and activities of collective interest, underline subject to applicable legislation.

P.R. LAWS ANN. tit. 21, § 4051.  Assuming, *arguendo*, that executing the DIA to award PRB an incentive grant using IVUM funds to expand the outlet mall was a proper exercise of executive power, it would still be subject to applicable laws.  Article 2.002 grants municipalities the power to impose and collect taxes in the manner provided therein and in accordance with the Puerto Rico Code and the laws of the Commonwealth.  Tit. 21, § 4052.  Act 81 therefore does not afford unrestricted power for municipal expenditure.  Keeping with Act 81, the Municipality could not commit public funds collected from the IVUM revenues to grant PRB (a private party) the development incentive grant; so, the DIA violates Act 81, as well.

Civil No. 13-1264 (GAG)

iii.   <u>Municipal Ordinances that Contravene Applicable Laws</u>

The DIA's execution is also clouded by municipal ordinances, which were approved by the Mayor and the municipal legislature, that are contrary to valid legislation.  As noted above, the Municipality executed Ordinance 12 to authorize and empower the Mayor to execute the DIA.  (<u>See</u> Docket No. 33-4 at 3.)  Its recitals say that it is in the best interest of the municipality to "grant additional incentives to [PRB] in connection with the expansion of the [outlet mall]."  (Docket No. 1-2 at 2.)  As further noted above, Section 3 of the Ordinance states that the DIA "develops <u>an incentive plan so that the [IVUM] generated from the profits on sales</u> from the expansion of the 'Prime Retail Outlets' shopping center <u>will be shared at 50%</u> to be able to attract investors who will occupy the stores in the expansion."  <u>Id.</u> (emphasis added.)  Ordinance 12 thus approves the use of IVUM for purposes other than those provided for in the Puerto Rico Code.  Ordinance 12 had to comply with applicable laws and it does not.  <u>See</u> tit. 21, § 4051.

Ordinance 12, in turn, provides that Ordinance 63 confers to the Mayor "the powers to encourage eligible businesses to stimulate the industrial, commercial, economic development and the development of jobs for our citizens."  (Docket No. 1-2 at 1.)  Ordinance 63 was drafted (by PRB's and Plaintiff's counsel and then submitted to the Municipality for its consideration and approval) to amend Ordinance 28.  (Docket Nos. 54-2; 37-1 at 7; 49-1 at 7.)  Ordinance 63, was amended, in pertinent part, to add Paragraph F of Section 3 to Ordinance 28, to afford the Mayor with the authority to grant eligible businesses "additional incentives beyond those established" in Ordinance 28 "as the Mayor may deem it necessary," which could "include <u>direct subsidies by the municipality, to be disbursed from the general funds</u> . . . , including, but not limited to, <u>funds generated from citizens contributions and the municipal licenses</u>. . ., amongst others. . . ."  (Docket Nos. 54-2 at 4; 39-8) (emphasis added.)  Notably, Ordinance 63 does not cite any legal authority

35

Civil No. 13-1264 (GAG)

that would confer the Mayor with this authority to grant direct municipal money to companies, including money generated from IVUM or other municipal taxation.

Plaintiff argues that the Municipality was not limited by the uses the Puerto Rico Code imposed on IVUM revenues because the Municipality's municipal legislature approved Ordinance 24.  As discussed above, this argument fails because municipal ordinances must be approved in accordance with applicable law and, as the court will discuss, Ordinance 24 was not.  Ordinance 24 directs all 1.5% of the IVUM tax to the general funds and indicates in a non-exhaustive manner certain uses for said revenues.  (Docket No. 49 at 9.)  Ordinance 24 states that the resources originating from the contributions obtained through the IVUM "will form part of the Municipality's General Fund and will be used, <u>without it being construed as a limitation</u>, . . ." for solid waste management, municipal infrastructure, the development of programs for youths, adults and elderly citizens, the municipality's recreational sports and cultural facilities, and for use as collateral to finance municipal works.  (Docket No. 48-1 at 12.) (emphasis added.)  The language of Ordinance 24 is clearly in conflict with the provisions of the Puerto Rico Code discussed above, which specify that 1% of the IVUM shall be used as specified by Section 6189 and the remaining .5% collected by the Secretary of the Treasury is to be used as exclusively prescribed by Sections 2706-2709.  It is clear that municipal ordinances must abide by applicable legislation.  See tit. 13, § 8189 (Section 6189 states that "[t]he municipalities may adopt regulations in accordance with the herein provided [Puerto Rico Code] through a municipal ordinance to such effect").

Courts have found a contract null because the ordinance approving it was contrary to applicable law.  See López v. Mun. San Juan, 121 P.R. Dec. 75, 89 (1988); Torrellas v. Mun. Yabucoa, 62 P.R. Dec. 217 (1943).  Accordingly, because Ordinance 12, which afforded the Mayor to authority to execute the DIA, and Ordinance 63 and 24 are contrary to Sections 6189 and

Civil No. 13-1264 (GAG)

2706-2709 of the Puerto Rico Code and Act 81, the DIA is null and void and thus unenforceable. This finding is simply "one more nail on the coffin" for Plaintiff's contentions.

**IV.   Conclusion**

For the reasons set forth above, the DIA is illegal, null and void.  It is contrary to applicable legislation, i.e., Act 81 and the Puerto Rico Code, and the ordinances through which it was approved are also contrary to law.  The execution of the DIA constituted an *ultra vires* action by the Mayor and the Municipality; it is, therefore, not binding upon the parties and cannot be enforced by Plaintiff.  Because the Municipality cannot be in breach of an illegal contract, Plaintiff cannot recover any payments thereunder.

This holding is consistent with the Puerto Rico Supreme Court decisions that vigorously apply the rules of government contracting which exist "to protect the public interest and not the contracting parties."  See, e.g., Hatton v. Mun. de Ponce, 134 P.R. Dec. at 1011, 1994 P.R. Offic. Trans. 909, 605 (1994) (emphasis added.)  This public policy requires that contractual relations between private entities and municipalities be conducted as prescribed by the applicable law.  Las Marias v. Mun. San Juan, 159 P.R. Dec. 868 (2003); see  P.R. LAWS ANN. tit. 31, § 3372 ("[t]he contracting parties may make the agreement and establish the clauses and conditions which they deem advisable, provided they are not in contravention of law, morals or public order.")  "In interpreting the provisions of [said] section . . . it cannot be ignored that in a State contract, the sane and correct administration of public funds is linked to the highest public interest and all government organs are obligated to comply with the essence of the constitutional provisions requiring that public funds only be spent for legitimate public ends".  APA Int'l Film Dist., Inc. v. Corp. de P.R. para la Difusion Publica, 394 F. Supp. 2d 443, 448-49 (D.P.R. 2005) (citing De Jesus Gonzalez v. Autoridad de Carreteras, 148 P.R. Dec. 255 (1999)).  When dealing with

**Civil No. 13-1264 (GAG)**

municipal contracting, the courts must keep in mind the well-established public policy that favors the application of restrictive norms.  <u>Cordero Velez v. Mun. de Guanica</u>, 170 P.R. Dec. 237, 248 (2007).

Although failing to establish that the DIA is lawful, Plaintiff, nevertheless, avers that the Municipality cannot dodge its obligations under it.  Private parties, however, must be extra vigilant when contracting with municipalities; otherwise, they may suffer damages if the contract, like here, runs counter to a clear public policy, the laws or the Constitution of Puerto Rico.  <u>Las Marias</u>, 159 P.R. Dec. At 868; <u>see</u> <u>Fernández & Gutiérrez v. Mun. San Juan</u>, 147 P.R. Dec. 824, 833 (1999); <u>Hatton</u>, 134 P.R. Dec. at 1010-1012; <u>Morales v. Mun. de Toa Baja</u>, 119 P.R. Dec. at 684-685, 19 P.R. Offic. Trans. at 726-727 (1941).  The Puerto Rico Supreme Court has assured that private parties must exercise a more active role when contracting with municipalities.  <u>Quest Diagnostics v. Mun. San Juan</u>, 175 P.R. Dec. 994 (2009).  This is not to say that only private parties must be observant of the law, this, of course, is a reciprocate duty.

Further, the public funds already paid by the Municipality, as payment of the development incentive grant, shall be returned to the Municipality because said payment was made pursuant to a null contract.  <u>See</u> <u>Mun. de Quebradillas v. Corp. Salud Lares</u>, 180 P.R. Dec. 1003, 1015-1006 (2011) ("If a municipality incorrectly spent public money pursuant to a void and null contract, it has the right to recover it. If we concluded otherwise, we would leave in private hands public funds that are not theirs.")  This holding does not favor without reason the Municipality; it is coherent with the well-established principles discussed above and the long-standing rule by the Puerto Rico Supreme Court that when courts are faced with controversies involving public funds, courts must

38

Civil No. 13-1264 (GAG)

principally be vigilant of the correct use and administration of public funds, because they are the monies of the citizens of Puerto Rico.  See Mun. de Quebradillas, 180 P.R. Dec. at 1015.[14]

       Accordingly, the court **DENIES** Plaintiff's Motion for Summary Judgment at Docket No. 34 and **DENIES in part** and **GRANTS in part** the Municipality's Motion for Summary Judgment at Docket No. 37.  As a result, the court **DISMISSES** the present case.

       The Clerk of Court shall notify and provide to the Puerto Rico Comptroller a copy of this Opinion and Order.

       **SO ORDERED.**

In San Juan, Puerto Rico this 16th day of March, 2015.

*s/ Gustavo A. Gelpí*
GUSTAVO A. GELPI
United States District Judge

---

[14]   In light of the court's holding that the DIA is null and void for being contrary to law, the court need not address the parties' other arguments, namely, that Plaintiff is the real party with interest in this case, the Municipality's other arguments in favor of the DIA's nullity, and Plaintiff's argument that the Municipality is in breach of its obligations under the DIA by failing to recognize its transfer to Plaintiff.